929 F.2d 1287
 59 USLW 2632
 Gunard A. NELSON, M.D.; Carol H. Nelson; Henry R. Fiola;
Priscilla L. Fiola; Lawrence R. Reding; and
Monna M. Reding, Appellants,
v.
Julius BECTON, Director, Federal Emergency Management
Agency; Federal Emergency Management Agency; and
National Flood Insurance Program, Appellees.
 No. 90-5204.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 10, 1990.
Decided April 8, 1991.
 
 Susan M. Weis, Minneapolis, Minn., for appellants.
 Lonnie F. Bryan, Minneapolis, Minn., for appellees.
 Before WOLLMAN, Circuit Judge, and HEANEY and FRIEDMAN*, Senior Circuit Judges.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 This is an appeal from the judgment of the United States District Court for the District of Minnesota (Judge James M. Rosenbaum) granting summary judgment dismissing the appellants' complaint seeking recovery under insurance policies issued pursuant to the National Flood Insurance Program. The district court denied recovery because the areas of the appellants' homes that had suffered damage from flooding were within a limitation on the coverage of the policies for "basement" areas. Nelson v. Becton, 732 F.Supp. 996 (D.Minn.1990). We affirm.
 
 I.
 
 2
 Under the National Flood Insurance Program, 42 U.S.C. Secs. 4011-4128 (1988), the Federal Emergency Management Agency (Management Agency) issues flood insurance policies to, among others, homeowners. The Standard Flood Insurance Policy (Standard Policy) is a detailed printed form, the language of which is prescribed by the Management Agency's regulations. See 42 U.S.C. Sec. 4013; 44 C.F.R. Sec. 61.4(a)(2), 61.13 (1989).
 
 
 3
 The appellants are three couples who own homes that were insured under the federal program. Two of them obtained their insurance prior to 1983, and the third thereafter. In 1983, the Management Agency amended the Standard Policy to limit the coverage of basements. This limitation, known as the "basement exclusion," was added to reduce the Federal Government's cost of providing flood insurance. See National Flood Insurance Program, Coverage, Sales and Eligibility Provisions, 48 Fed.Reg. 39,066-68 (1983).
 
 
 4
 The first page of the policy, as subsequently amended, stated in Article II, captioned "DEFINITIONS",
 
 
 5
 "Basement" means any area of the building having its floor subgrade (below ground level) on all sides.
 
 
 6
 Article V of the policy, captioned "PROPERTY NOT COVERED", stated:
 
 
 7
 We do not cover and will not pay for damage to or loss of any of the following:
 
 
 8
 ....
 
 
 9
 F. ... finished basement walls, floors, ceilings and other improvements to a basement having its floor subgrade on all sides, and contents, machinery, building equipment and fixtures in such basement areas; except that, as to this subparagraph (F), coverage is provided in basement areas ... [for certain equipment].
 
 
 10
 In the policy renewal declarations attached to the policies, which, under the definition of "Policy", were part of the policies and specified the details of the insurance provided and the property covered, the "BUILDING" being insured was described, in one instance as "THREE OR MORE FLOORS INCLUDING FINISHED BASEMENT" and in the two other instances as "TWO FLOORS INCLUDING FINISHED BASEMENT". The "CONTENTS" to be insured were described as "HOUSEHOLD CONTENTS LOCATED IN BASEMENT AND ABOVE". The declarations stated: "LIMITED COVERAGE IN BASEMENT. SEE 'PROPERTY NOT COVERED' SECTION OF POLICY FOR SPECIFIC ITEMS."
 
 
 11
 Following a flooding of the appellants' homes that caused substantial damage in their lower floors, the appellants filed claims under their policies for their losses. Each of the appellants' homes had what they call a "walkout" basement, namely, one which had a direct exit from the rear of the lower level to the yard behind the house. To go from the exit into the yard, however, it was necessary to go up at least one step.
 
 
 12
 The Management Agency denied coverage for the damage to the appellants' lower levels. It ruled that because of the step ascending from the basement exit to the rear yard, the lower levels were "subgrade" on all sides and therefore were within the basement exclusion.
 
 
 13
 The appellants then filed the present action in the district court, pursuant to 42 U.S.C. section 4072 (1988), against, among others, the director of the Management Agency (the appellee Becton), the Management Agency itself, and the National Flood Insurance Program. The court granted those defendants' motion for summary judgment.
 
 The court held that the policy
 
 14
 unambiguously excludes from coverage certain losses to a home's lowest level when its floor is subgrade on all sides.... The plaintiffs acknowledge and their own photographs indicate that their homes can only be exited by stepping up to reach ground level. Each plaintiff's home's lowest level is subgrade on all sides.
 
 The court concluded:
 
 15
 This Court therefore holds the lower levels of plaintiffs' homes were "basements" as that term is defined by the [Standard Policy]. While this Court is sympathetic to plaintiffs' plight, subgrade means below ground level and the definition is not vague or ambiguous. The [Standard Policy]'s definition of basement must control. The policy exclusion clearly applies to plaintiffs' homes.
 
 
 16
 Nelson v. Becton, 732 F.Supp. 996, 999 (D.Minn.1990).
 
 II.
 
 17
 A. We agree with the district court that the basement exclusion provision is unambiguous and that that provision applies to the lower levels of the appellants' homes.
 
 
 18
 The definition of "Basement" in the policy is straightforward and clear--an area of the building, the floor of which is "subgrade (below ground level) on all sides." Similarly, the "PROPERTY NOT COVERED" provision of the policy unambiguously states that, with exceptions not here relevant, the insurance does not "cover and will not pay for damage to ... a basement having its floor subgrade on all sides...."
 
 
 19
 The floors of the lower levels of the appellants' homes were subgrade on all sides. In order to go from that level out to the yard, it was necessary to go up at least one step. The floor levels therefore were subgrade on the rear of the house because their grade was below the ground level at the point of exit. The extent to which they were subgrade, whether 6, 8, or 40 inches, is immaterial under the policy. The only question is whether they were subgrade or at ground level.
 
 
 20
 Indeed, the appellants do not contend that the floors of the lower levels of their houses were not subgrade in the rear or attempt to explain why a floor that is 6 to 8 inches below ground on one side is not "subgrade" on that side. Instead, they argue that the basement exclusion of the policy was not intended to cover so-called "walkout" basements, which have a direct exit to the yard.
 
 
 21
 Nothing in the policy language, however, even refers to or uses the word "walkout," which appears to be a term used in the real estate business to describe a home of that type. Although the appellants argue that walkouts generally are not considered basements, the question is whether the appellants' walkouts contain basements under the policy definition of the term. "[W]here a term is defined in the policy, the court is bound by the policy definition." Enterprise Tools, Inc. v. Export-Import Bank, 799 F.2d 437, 439 (8th Cir.1986), cert. denied, 480 U.S. 931, 107 S.Ct. 1569, 94 L.Ed.2d 761 (1987) (citing Pearce v. General American Life Ins. Co., 637 F.2d 536, 539 (8th Cir.1980)). If the walkout side of the basement is subground, it is a basement under the policy.
 
 
 22
 The appellants refer to a footnote in a lengthy report from the General Accounting Office to two members of Congress which stated: "The flood insurance program's definition of a basement is an area of a building having its floor below ground on all sides. FIA [Federal Insurance Administration] does not consider 'walk out' basements as basements for insurance purposes." Neither this statement nor anything else upon which the appellants rely warrants interpreting the unambiguous policy language defining and limiting the coverage of "basements" to except walkout basements.
 
 
 23
 The unambiguous language of the basement exclusion is consistent with the principle that insurance policies should be as clear as possible, so that insureds will know the precise scope of their coverage and insurers will know the precise extent of their liability. See generally 44 C.J.S. Insurance Sec. 255 (1945). Under the basement exclusion, only limited coverage is provided for the lower level of a house that is subgrade on all sides. Although the appellants stress that only one step upward is required to get from their basements to the yard, on what reasonable basis should coverage be made to depend upon the number of steps that separated the basement level from the yard? Under the appellants' theory, would a walkout basement that was 6 steps below ground still not be a basement?
 
 
 24
 The Management agency was justified in drafting the exception for flood damage to "basements" in terms of whether the area involved was subgrade on all sides.
 
 
 25
 B. The appellants contend that, as construed by the district court and the Management Agency, the basement exclusion is unconscionable and therefore should not be enforced.
 
 
 26
 Even assuming arguendo that the doctrine of unconscionability properly may be applied to a federal insurance policy, the language of which is mandated by a federal regulation, the appellants have not shown that application of the basement exclusion to their houses would be unconscionable.
 
 
 27
 As we have held, the language of the policy is unambiguous and clear. If the appellants had read their policies--two of them admitted in depositions that they had not--the scope of coverage should have been apparent. Moreover, the policy renewal declarations attached to the policy described the insured premises as "INCLUDING FINISHED BASEMENT", stated that the insurance covered "HOUSEHOLD CONTENTS LOCATED IN BASEMENT AND ABOVE", and noted that there was "LIMITED COVERAGE IN BASEMENT", as specified in the "PROPERTY NOT COVERED" section of the policy. The limited extent of the coverage for basements thus was fully and clearly disclosed to the appellants.
 
 
 28
 Although the appellants contend that they obtained the insurance to protect their homes, including the basements, from flooding, there is evidence in the record that mortgage lenders required the insurance. Indeed, had it not been for the federal program, the appellants might have had no flood insurance at all since "many factors have made it uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions...." 42 U.S.C. Sec. 4001(b)(1) (congressional findings and declaration of purpose). We cannot conclude that it would be unconscionable to apply the basement exclusion as written to limit the policy's coverage of the appellants' basements.
 
 III.
 
 29
 The appellants recognize, as the Standard Policy provides, that federal common law governs the interpretation of the policy. Sodowski v. National Flood Insurance Program, 834 F.2d 653, 655 (7th Cir.1987), cert. denied, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 619 (1988); Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131, 135 (1st Cir.1984). They urge us to adopt, as federal common law, the doctrine of reasonable expectations, which they say 12 states, including Minnesota, have adopted. As the Supreme Court of Minnesota explained the doctrine in Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co., 366 N.W.2d 271, 277 (Minn.1985), upon which the appellants rely, even an unambiguous policy may be "interpreted according to the reasonable expectations of the insured." The appellants urge that under this principle the district court improperly granted summary judgment against them, since there were disputed issues of material fact regarding the nature of their expectations and the reasonableness thereof.
 
 
 30
 In their reply brief, the appellants seem to urge us to adopt, as federal common law, the Minnesota rule of reasonable expectations. Under that approach the applicability and scope of the doctrine of reasonable expectations for federal flood insurance policies would depend upon the particular state law to be applied. The appellants state that 12 states have applied the doctrine to insurance policies. Under the appellants' theory, presumably federal common law would not apply the doctrine in a situation where governing state law does not recognize it. What would the rule be for states that have not considered the question?
 
 
 31
 The Standard Policies issued by the Management Agency under the National Flood Insurance Program are by regulation uniform throughout the country. See 42 U.S.C. Sec. 4013; 44 C.F.R. Sec. 61.4(a)(2), 61.13. Their coverage should not vary from state to state depending upon the vagaries of state law. "[F]ederal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules" rather than "incorporat[ing]" "state law ... as the federal rule of decision." United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979) (quoting Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)) (footnote omitted).
 
 
 32
 The purpose of the National Flood Insurance Program is to provide flood insurance, which otherwise would not be available, on a uniform nationwide basis. To apply the varying reasonable expectations doctrines of the insurance laws of individual states would "frustrate [these] specific objectives of the Federal program[ ]." Kimbell Foods, 440 U.S. at 728, 99 S.Ct. at 1458.
 
 
 33
 Perhaps the appellants are more broadly arguing that we should adopt as the federal common law governing the interpretation and application of the Standard Policy the general principle of the doctrine of reasonable expectations, and are referring to the Minnesota law only as illustrative of what the federal common law should be. The considerations that warrant applying the doctrine in a suit against a private insurer, however, may be quite different from those involved in determining the coverage of a federal insurance policy, the language of which is mandated by a federal regulation.
 
 
 34
 To apply the doctrine of reasonable expectations to permit the appellants to recover for flood damage to their "basements" under the Standard Policy, which expressly excludes such damage, would be tantamount to our modifying the underlying federal regulation that prescribes the language of the basement exclusion clause. We decline to take such a far-reaching step, the outer reaches of which cannot be perceived at this time.
 
 
 35
 The judgment of the district court is affirmed.
 
 
 36
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 37
 I respectfully dissent. In particular, I disagree with the majority's reasoning in Section III of its opinion. The doctrine of reasonable expectations should be applied in this case, and thus the district court's summary judgment should be reversed because the homeowners have raised genuine issues of material fact regarding their reasonable expectations.
 
 
 38
 Whether the rule of honoring reasonable expectations should be applied to policies issued pursuant to the National Flood Insurance Program (NFIP) is a question of first impression for this court. The merits thus deserve more scrutiny than the majority has offered.
 
 
 39
 The policy expressly provides, and courts have repeatedly held, that federal common law governs the interpretation of the policy. See, e.g., Sodowski v. National Flood Ins. Program, 834 F.2d 653, 655 (7th Cir.1987). Courts have further recognized that "in enacting the NFIP, Congress did not intend to abrogate standard insurance law principles." Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131, 135 (1st Cir.1984) (citation omitted). Instead, Congress intended courts to utilize the traditional common law approach and draw upon standard insurance law principles to inform the judiciary's resolution of NFIP cases. Id. Here, the majority refuses to apply--indeed, it summarily rejects--what is quickly becoming the standard insurance law principle of honoring reasonable expectations.
 
 I.
 
 40
 The relevance of this doctrine arises from the tension between what the majority labels the unambiguous language of the policy and the homeowners' conflicting understanding of this language. According to the majority, the policy unambiguously defined "basement." The homeowners argue otherwise and have strongly supported their contention that they believed the insurance policy applied to their walkout basements. The homeowners' maintenance of flood insurance for many years suggests the legitimacy of this belief. Presumably, because floods pose the greatest likelihood of damage to the lowest floor, the primary objective of homeowners who seek flood insurance is to insure their basements against flood damage.
 
 
 41
 The basements at issue here are undeniably walkout basements. Because of their accessibility, walkout basements acquire a character different from ordinary basements, and due to this character, many people would not even consider a walkout to be a basement. It was entirely reasonable for the homeowners to assume that their walkout basements were not included in the policy's definition of basement. The operative word in this definition, "subgrade," conjures up an image of the classic basement, an area of a building which is primarily below the ground level. Ironically, even the government adjuster who first inspected the flooding of the homeowners' walkouts indicated that the damage would be covered. Here, rather than applying a common sense definition of "subgrade," the majority invokes a technical interpretation, which carried to a logical extreme could define the first story of a home as a basement.[1]
 
 
 42
 Whether the language is given its common sense meaning or interpreted technically, the policy is ambiguous. When such an ambiguity exists, the doctrine of reasonable expectations should be applied. Indeed, an acknowledged expert in insurance law, Judge Robert Keeton, has identified the confusion such as that caused by the basement exclusion in this case as the very reason the doctrine exists:
 
 
 43
 As an ideal this principle incorporates the proposition that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters.
 
 
 44
 Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 967 (1970). After explaining that the doctrine of honoring reasonable expectations is an extension of the principle of resolving ambiguities against the insurer, Keeton outlined the essence of the doctrine:
 
 
 45
 Arguably [honoring reasonable expectations] should be regarded as a corollary of the principle of resolving ambiguities against the insurer. The principle of honoring reasonable expectations should be extended further, protecting the policyholder's reasonable expectations as long as they are objectively reasonable from the layman's point of view, in spite of the fact that had he made a painstaking study of the contract, he would have understood the limitation that defeats the expectations at issue.
 
 
 46
 Id.
 
 II.
 
 47
 The doctrine of reasonable expectations is rapidly becoming standard insurance law. At least twenty states have adopted the rule of reasonable expectations.[2] Moreover, although a federal court should not selectively adopt doctrines into the federal common law merely to reflect the law of the state in which the court sits, it is important to note that a majority of the states in this circuit have adopted the reasonable expectations doctrine.[3]
 
 
 48
 Scholars have embraced the doctrine as well. See, e.g., R. Keeton & A. Widiss, Insurance Law Sec. 6.3 (1988); Abraham, Judge-Made Law and Judge-Made Reasonable Expectations of the Insured, 67 Va.L.Rev. 1151 (1981). Abundant policy reasons support the adoption of the doctrine of honoring reasonable expectations. First, insurance policies are lengthy, complicated documents, which frequently are not read by the insured. Second, insurance policies are classic examples of adhesion contracts, leaving the consumer with minimal bargaining power. Third, protecting reasonable expectations frequently prevents an unconscionable result. Fourth, if insurance is procured for a specific reason and the insurance company could reasonably ascertain this reason, the expectations of the insured should be protected.
 
 
 49
 Each of these policy factors is relevant to this case. First, the policy at issue is an eight-page document with two columns of fine, single-spaced print on each page. Further, the pivotal policy language is located in two separate sections of the document: the "basement exclusion" appears in an eighteen-line sentence in Article V of the policy, while "basement" is defined several pages earlier in Article II of the policy.
 
 
 50
 Second, the government created the NFIP to fill a void in the marketplace, leaving the homeowner with little alternative but to deal with the government and accept the terms of the government's contract. Throughout its opinion, the majority suggests that adopting the reasonable expectations doctrine in this case would not be appropriate because the language of the policy is a product of regulatory directive. If anything, this origin highlights the adhesive nature of the policy; and as will be discussed shortly, the source of the policy language should not inhibit the application of the reasonable expectations principle.
 
 
 51
 Finally, two of the homeowners had maintained flood insurance continuously for ten and thirteen years, respectively. Undoubtedly, the homeowners' primary purpose in securing flood protection was to insure their walkouts from damage. If the homeowners had known that their walkouts would be excluded from coverage, it is unlikely that they would have opted to continue their flood insurance, since first and second stories are far less susceptible to flooding than walkouts. Simply stated, if the homeowners are denied coverage, then the consideration for which they bargained and for which they paid premiums is being withheld.
 
 III.
 
 52
 This is a case in which the technical language of the insurance policy conflicts with a reasonable layman's understanding of the insurance coverage. I believe that the contract is ambiguous, and while the doctrine of reasonable expectations does not require ambiguity for its application, the presence of ambiguity strengthens the argument for adopting this standard in this case. If the homeowners had realized that their walkouts were excluded from coverage, in other words, if the contract were unambiguous and clear to them, their primary, and most likely decisive, reason for incurring premium costs would have been eliminated. Fulfilling the homeowners' reasonable expectations would provide them with the insurance for which they thought they had contracted. Such a result is particularly justified when it appears that the homeowners believed their walkouts were insured and when the government reasonably could have inferred this reliance.
 
 
 53
 In such a situation, the reasonable expectations of the homeowners should be protected. Congress intended the courts to draw upon standard insurance principles to adjudicate disputes under the NFIP. The doctrine of reasonable expectations is becoming a standard principle of insurance law. Accordingly, it should be incorporated into the federal common law, particularly in a case as compelling as this.
 
 
 54
 The majority's bald suggestion that the reasonable expectations doctrine could be applied in a suit against a private insurer but not in an action against the federal government lacks any compelling support. No legal basis is offered for this assertion nor does the majority proffer any logical reason for its claim. Whether the insurance policy is a product of private industry or public regulations does not affect the applicability of the doctrine. Indeed, the focus of reasonable expectations analysis is on the understandings of the consumer, not on the source of the contract, which is relevant only to the extent that the policy is technical and wordy.
 
 
 55
 The homeowners present persuasive arguments for the incorporation of the doctrine of reasonable expectations into federal common law. Accordingly, I would reverse the district court's grant of summary judgment because the homeowners have raised genuine issues of material fact regarding the applicability of the doctrine to their situation.
 
 
 
 *
 DANIEL M. FRIEDMAN, Senior Circuit Judge, of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 For instance, if the ground surrounding a home was actually higher than the floor of the home, the entire first story would be defined as a basement and thus excluded from flood protection under the majority's interpretation of the policy
 
 
 [2]
 See Smith v. Auto-Owners Ins. Co., 500 So.2d 1042 (Ala.1986); Stordahl v. Gov't Emp. Ins. Co., 564 P.2d 63 (Alaska 1977); State Farm Fire & Cas. Co. v. Powers, 163 Ariz. 213, 786 P.2d 1064, (Ariz.App.1989); Gray v. Zurich Ins. Co., 65 Cal.2d 263, 419 P.2d 168, 54 Cal.Rptr. 104 (1966); Cody v. Remington Elec. Shavers, 179 Conn. 494, 427 A.2d 810 (1980); State Farm Mut. Auto. Ins. Co. v. Johnson, 320 A.2d 345 (Del.1974); Corgatelli v. Globe Life & Acc. Ins. Co., 96 Idaho 616, 533 P.2d 737 (1975); C & J Fertilizer, Inc. v. Allied Mut. Ins. Co., 227 N.W.2d 169 (Iowa 1975); Simon v. Continental Ins. Co., 724 S.W.2d 210 (Ky.1987); Atwater Creamery Co. v. Western Nat'l Mut., 366 N.W.2d 271 (Minn.1985); Bennett v. American Life & Acc. Ins. Co., 495 S.W.2d 753 (Mo.App.1973); Dairyland Ins. Co. v. Esterling, 205 Neb. 750, 290 N.W.2d 209 (1980); Hanover Ins. Co. v. Grondin, 119 N.H. 394, 402 A.2d 174 (1979); Campbell Soup Co. v. Liberty Mut. Ins. Co., 239 N.J. Super. 488, 571 A.2d 1013
 (N.J.Super.Ct.1988); Pribble v. Aetna Life Ins. Co., 84 N.M. 211, 501 P.2d 255 (1972); Foremost Ins. Co. v. Travelers Ins. Co., 54 A.D.2d 150, 388 N.Y.S.2d 402 (N.Y.Sup.Ct.1976); Mills v. Agrichemical Aviation, Inc., 250 N.W.2d 663 (N.D.1977); Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 388 A.2d 1346 (1978); National Mut. Ins. Co. v. McMahon & Sons, Inc., 356 S.E.2d 488 (W.Va.1987); Patrick v. Head of the Lakes Coop. Elec., 98 Wis.2d 66, 295 N.W.2d 205 (Wis.Ct.App.1980).
 
 
 [3]
 See C & J Fertilizer, Inc. v. Allied Mut. Ins. Co., 227 N.W.2d 169 (Iowa 1975); Atwater Creamery Co. v. Western Nat'l. Mut., 366 N.W.2d 271 (Minn.1985); Bennett v. American Life & Acc. Ins., 495 S.W.2d 753 (Mo.App.1973); Dairyland Ins. Co. v. Esterling, 205 Neb. 750, 290 N.W.2d 209 (1980); Mills v. Agrichemical Aviation, Inc., 197 Neb. 675, 250 N.W.2d 633 (1977)