ZAREMBA EQUIPMENT, INC v
HARCO NATIONAL INSURANCE COMPANY

Docket No. 274745. Submitted April 8, 2008, at Detroit. Decided July 31,
    2008, at 9:00 a.m. Leave to appeal sought.

Zaremba Equipment, Inc., brought an action in the Otsego Circuit
    Court against Harco National Insurance Company and Patrick
    Musall, who was Harco's agent, after a fire destroyed the plain-
    tiff's building and its contents. The complaint alleged negligence,
    fraud, innocent misrepresentation, breach of contract, promissory
    estoppel, and other claims, all related to the adequacy of the
    coverage provided in the insurance policy and representations that
    Musall made or failed to make concerning that coverage. The jury
    found for the plaintiff on all of its claims and awarded the damages
    the plaintiff requested. The court, Dennis F. Murphy, J., denied the
    defendants' motions for judgment notwithstanding the verdict and
    a new trial. The defendants appealed.

    The Court of Appeals *held*:

    1. An insurance agent whose principal is the insurance company
    generally owes no duty to advise a potential insured about any
    insurance coverage. An event that alters the nature of the relation-
    ship between the agent and the insured, however, may produce a
    special relationship and create a duty on the agent's part to advise the
    insured in some respect regarding insurance issues, including the
    adequacy of the coverage. A change in the agent-insured relationship
    occurs when (1) the agent misrepresents the nature or the extent of
    the coverage offered or provided, (2) the insured makes an ambiguous
    request that requires clarification, (3) the insured makes an inquiry
    that requires advice and the agent gives inaccurate advice, or (4) the
    agent assumes an additional duty by an express agreement with or a
    promise to the insured.

    2. The trial court erred by refusing to instruct the jury, as the
    defendants requested, that the plaintiff had a duty to read the
    insurance policy. MCL 600.2957(1) and MCL 600.6304 required
    the trial court to give this instruction concerning comparative
    negligence: An insured must read the insurance policy. While the
    jury found that Musall and the plaintiff shared a special relation-
    ship, that finding alone does not eliminate any claim of compara-

tive fault associated with or arising from the plaintiff's duty to read the policy and related documents. The negligence of one party does not eliminate the legal requirement that an opposing party use ordinary care, and a reasonable jury could have concluded that the plaintiff's failure to read the policy would qualify as comparative negligence. Because three negligence theories raised by the plaintiff were submitted to the jury, and a comparative-negligence analysis applied to only some of those theories, the entire negligence verdict must be reversed because it is impossible to determine which liability theories the jury adopted.

3. An insurance agent owes a duty to procure the insurance coverage requested by an insured. An agent owes no duty to procure coverage that would meet or exceed the insured's expectations, however, and on remand the trial court should not instruct the jury to that effect.

4. A party claiming fraud or innocent misrepresentation must prove reasonable reliance on the material misrepresentation. The jury had to decide whether the plaintiff's failure to read the policy constituted a proximate cause of the plaintiff's damages. The record could also have supported the plaintiff's claims related to reliance on Musall's representations about the accuracy of Musall's replacement-value calculations, matters on which reading the policy and related documents would have shed no light. A new trial is required.

5. The trial court erred by permitting the jury to consider the plaintiff's promissory-estoppel claim. The plaintiff failed to identify any promises that Musall made beyond those contained in the policy. Musall's alleged representations concerning full coverage or replacement-cost coverage were words of assurance or statements of belief, not promises. On retrial, a promissory-estoppel claim may not be submitted to the jury.

6. A court should determine the need for expert testimony in an insurance-coverage case on a case-by-case basis. The need for expert testimony depends on the nature of the underlying claims of negligence against the agent. If the duty allegedly breached falls beyond the average juror's understanding, the trial court may require the party alleging negligence to produce expert testimony supporting the claim. Whether Musall breached the duty of accurately representing the nature and extent of the insurance coverage, however, was a question of fact that the jury could answer on the basis of the jurors' common knowledge and ordinary experiences. An average juror could also decide whether Musall provided the plaintiff with clear and accurate advice regarding the replacement-value coverage or instead failed to advise the plaintiff that the coverage would not suffice to replace the building.

7. The plaintiff's use of letters that included references to ongoing settlement negotiations did not violate MRE 408, the rule that governs the admission of evidence concerning settlements. While evidence concerning settlements is generally inadmissible to prove liability for or the invalidity of the claim or its amount, the rule allows the evidence to be used for other purposes, including "negativing a contention of undue delay." Thus, evidence of settlement discussions may also be admitted to prove undue delay, which was an issue in this case and for which the plaintiff sought penalty interest under MCL 500.2006. Any error relating to the letters being hearsay was harmless.

8. The defendants failed to brief any legal challenges to the jury's awards for breach of contract, recovery of insurance premiums, and penalty interest and have thus abandoned those challenges.

Affirmed in part, reversed in part, vacated in part, and remanded for a new trial.

O'CONNELL, P.J., concurring in part and dissenting in part, concurred in all respects except the majority's determination that an expert witness was not required for the negligence claims. While the need for expert testimony must be determined on a case-by-case basis, it was necessary in this case. There were numerous significant questions related to the practices of insurance agents that involved matters of specialized knowledge and fell far outside a layperson's general knowledge.

1. INSURANCE — DUTIES OF INSURANCE AGENTS — NEGLIGENCE OF INSURANCE AGENTS — SPECIAL RELATIONSHIPS WITH INSURANCE AGENTS.

An insurance agent whose principal is the insurance company generally owes no duty to advise a potential insured about any insurance coverage, but an event that alters the nature of the relationship between the agent and the insured may produce a special relationship and create a duty to advise the insured in some respect regarding insurance issues, including the adequacy of the coverage; a change in the agent-insured relationship occurs when (1) the agent misrepresents the nature or the extent of the coverage offered or provided, (2) the insured makes an ambiguous request that requires clarification, (3) the insured makes an inquiry that requires advice and the agent gives inaccurate advice, or (4) the agent assumes an additional duty by an express agreement with or a promise to the insured.

2. INSURANCE — NEGLIGENCE — COMPARATIVE NEGLIGENCE — DUTY TO READ INSURANCE POLICIES.

The existence of a special relationship between an insurance agent and insured that creates a duty for the agent to advise the insured

regarding some insurance issue does not eliminate a claim of comparative negligence associated with or arising from the insured's duty to read the policy and related documents (MCL 600.2957[1], 600.6304).

3. Evidence — Expert Witnesses — Insurance-Coverage Issues.

The need for expert testimony in a negligence case involving issues of insurance coverage depends on the nature of the underlying claim against the insurance agent, and the trial court should determine the need on a case-by-case basis; expert testimony might be necessary if the duty allegedly breached falls beyond the average juror's understanding (MRE 702).

4. Evidence — Admissibility of Evidence — Compromise and Settlement — Settlement Negotiations.

Evidence of settlement-related discussions is admissible for the purpose of proving undue delay (MRE 408).

*Howard & Howard Attorneys, P.C.* (by *Michael F. Wais*), for the plaintiff.

*John R. Monnich* and *John P. Jacobs, P.C.* (by *John P. Jacobs*), for the defendants.

Before: O'CONNELL, P.J., and BORRELLO and GLEICHER, JJ.

GLEICHER, J. Plaintiff Zaremba Equipment, Inc., commenced this insurance coverage lawsuit after a fire destroyed its premises. A jury awarded plaintiff $2,353,778, exclusive of costs, attorney fees, interest, and case evaluation sanctions. We affirm in part, reverse in part, vacate in part, and remand this case for further proceedings.

I. UNDERLYING FACTS AND PROCEEDINGS

On February 21, 2003, a fire consumed the primary building occupied by plaintiff, a family-owned business that sells and services agricultural equipment, commercial vehicles, and seasonal items, such as snow blowers

and lawn mowers. Defendant Harco National Insurance Company sold plaintiff the insurance policy at issue in this case, which took effect on February 1, 2003, and constituted plaintiff's seventeenth consecutive Harco policy. Defendant Patrick Musall, Harco's agent, took plaintiff's order for the most recent commercial insurance policy considered here.

Plaintiff filed suit seeking to recover (1) damages for breach of the commercial-insurance contract, (2) penalty interest pursuant to MCL 500.2006, and (3) damages for defendants' failure to provide plaintiff with sufficient "replacement cost insurance coverage" of plaintiff's business building and its contents. The primary issues on appeal involve the coverage of the building and its contents. The 2003-2004 policy stated limits of $525,000 for the building, and $700,000 for its contents. After the fire, plaintiff learned that it would cost $1,192,000 to replace the building.

Plaintiff's complaint alleged that at an unspecified time before the fire, it informed defendants that "it wanted to be fully insured so it could rebuild and replace its property in the event of a complete loss." According to the complaint, Musall represented that Harco could issue a policy for "replacement cost insurance coverage" adequate to rebuild plaintiff's building and replace its contents. The complaint additionally alleged that Harco's failure to provide replacement cost coverage as promised constituted fraud and innocent misrepresentation. The complaint also pleaded a promissory estoppel claim and contained counts entitled "Breach of Fiduciary Duty," "Breach of Duty to Advise," and "Negligence," all similarly premised on Musall's inaccurate representation concerning the sufficiency of the promised insurance coverage. The negligence count set forth seven duties allegedly

breached by Musall, including failures to accurately advise plaintiff and to "accurately represent the nature and extent" of the building and contents coverage.

Defendants moved for partial summary disposition under MCR 2.116(C)(8), arguing that pursuant to *Harts v Farmers Ins Exch*, 461 Mich 1; 597 NW2d 47 (1999), Musall owed plaintiff no duty to advise it regarding the adequacy of the insurance it requested and, consequently, the complaint failed to state any claims other than those for breach of contract and recovery of penalty interest. Defendants explained that plaintiff's complaint lacked specific allegations establishing the existence of a special relationship between plaintiff and Musall and that in the absence of any special relationship, Musall owed plaintiff no duty other than to provide it the insurance it sought. Defendants withdrew this motion after plaintiff filed an amended complaint alleging that Musall had misrepresented the "nature and extent of [plaintiff's] coverage . . . ." The amended complaint asserted that Musall's misrepresentations gave rise to a "special relationship" between the parties and imposed on defendants the duty to "accurately advise [plaintiff] about the coverage provided" under its policy.

Shortly before the scheduled trial date, defendants filed motions in limine seeking to prohibit the introduction at trial of (1) communications between plaintiff's attorneys and Ed Whalen, Harco's adjuster, (2) testimony that the Harco policy was "too long or too difficult to read," and (3) any opinions regarding "adjusting" offered "by anyone other than a licensed adjuster." The trial court denied the motions in limine, and the case proceeded to trial.

The evidence revealed that plaintiff's Harco policies for 2002-2003 and 2003-2004 stated a policy limit of

$525,000 on plaintiff's building and shared identical language describing the building and contents coverage:

### C. Limits of Insurance

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

\* \* \*

### G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

\* \* \*

### 3. Replacement Cost

\* \* \*

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

Musall testified that since 1998 or 1999 he had met with Jimmy Zaremba, plaintiff's business manager, at least twice a year to discuss plaintiff's insurance needs, Harco's available coverages, and potential policy limits. Musall admitted that at some point before plaintiff accepted Harco's 2002-2003 insurance proposal, Jimmy presented a "Customgard John Deere Insurance Proposal" prepared for plaintiff.[1] The Deere insurance proposal included a "Building Coverage" limit of $450,000 and identified an applicable "Extended Recovery Endorsement" that included "Guaranteed Replacement Cost." Musall conceded that Jimmy had asked him to "meet or beat" the Deere proposal and expressed a desire "to be fully insured." Musall utilized a software program called "Marshall & Swift" to prepare a "cost estimate" for reconstructing plaintiff's building, which calculated a building value of $494,449. According to Jimmy, Musall represented that Marshall & Swift was "the leader in the industry, and this is what insurance agents use all the time to come up with evaluations on a building." Although Musall did not recall telling Jimmy about the Marshall & Swift estimate, he admitted that after its preparation, plaintiff increased its building coverage limit to $525,000.

Musall also conceded that he made specific recommendations in response to Jimmy's request that plaintiff be "fully insured." He admitted that he would have recommended more coverage if he had known that it would cost $1,192,000 to replace the building because the "intent was there" to insure plaintiff "for the cost of replacing the building." Musall further explained that if

---

[1] Although Musall could not remember exactly when Jimmy produced the Deere proposal, Musall opined that he sold plaintiff at least two additional Harco policies after he and Jimmy reviewed and discussed the Deere quotation.

Jimmy had asked for $1.5 million of building coverage, Musall would have advised him that "I didn't feel he needed that much coverage."

Jimmy recalled that in July 2001 a car had run into a nearby restaurant, killing some customers. Jimmy heard that the restaurant owner "had a holy nightmare" with his insurance company and realized that if something happened to plaintiff's building, zoning issues would preclude rebuilding in the same location. At about the same time, Jimmy learned of Deere's "guaranteed replacement coverage" and consulted Musall to discuss the adequacy of plaintiff's coverage and to communicate his desire that plaintiff be "fully insured." Jimmy asked Musall to compare plaintiff's 2001 Harco coverage, which included an 80 percent coinsurance provision that obligated plaintiff to cover 20 percent of its own insured losses, with the Deere proposal. According to Jimmy, Musall represented that for $500 less than the Deere quotation, Harco would provide a building policy limit of $525,000 and that "with the replacement costs, we would be fully insured."

On April 18, 2002, Jimmy signed a two-year "Harco Dealer Package Application," which included a "Property Limits Schedule." The schedule described limits of $525,000 for the building and eliminated coinsurance. On the same schedule, Musall wrote, "All are agreed value," and checked a box indicating that the coverage was based on "replacement" value. Jimmy admitted that all of Musall's representations regarding the adequacy of plaintiff's coverage, including the Deere and appraisal discussions, concerned the 2002-2003 policy issued the year before the policy covering the fire loss.

On January 10, 2003, Jimmy met with Musall and accepted Harco's insurance proposal for the policy year beginning February 1, 2003. The parties agreed that

neither Musall nor Harco delivered the 2003 policy to plaintiff before the February 21, 2003, fire. Jimmy conceded that he had not read any of the previous Harco policies, the two-year coverage application that he signed in 2002, or the renewal application signed in 2003.

The jury found for plaintiff on all claims and awarded damages exactly as itemized by plaintiff's accounting expert, including an award of $496,185 for breach of contract, $258,554 in penalty interest, and $42,481 for "recovery of insurance proceeds." For plaintiff's building and contents, the jury awarded $1,556,558 under three theories separately entitled on the verdict form: negligence, fraud or innocent misrepresentation, and promissory estoppel. The trial court denied defendants' motions for judgment notwithstanding the verdict and a new trial.

On appeal, defendants raise several challenges to the jury's award relating to the building and contents coverage. We now address individually each theory supporting those aspects of the jury's award.

## II. CHALLENGES TO THE NEGLIGENCE VERDICT

### A. COMPARATIVE NEGLIGENCE AND PLAINTIFF'S DUTY TO READ ITS INSURANCE POLICY

Defendants challenge the trial court's refusal to instruct the jury that plaintiff had a duty to read its insurance policies. Although plaintiff did not receive a copy of the 2003-2004 Harco policy before the fire, defendants insist that plaintiff owed a duty to read its 2002-2003 insurance policy and the 2003-2004 insurance quotation it possessed, both of which set forth identical and specific limitations of building coverage. According to defendants, the earlier policy and the

current quotation language expressly contradict any notion that the policy provided "full replacement value" coverage. Defendants maintain that plaintiff's admitted failure to read the prior policy and the 2003-2004 quotation constituted comparative negligence and was a proximate cause of plaintiff's damages. Defendants reason that the trial court thus erred by failing to instruct the jury regarding plaintiff's duty to read its policy and by refusing to permit the jury to assess comparative fault. Plaintiff responds that it cannot be held to a duty to read the 2003-2004 policy that it did not yet possess and contends that Harco cannot "hide behind" policy language when a special relationship existed between the insurer and the insured.

This Court reviews de novo the content of a trial court's jury instructions. *Case v Consumers Power Co,* 463 Mich 1, 6; 615 NW2d 17 (2000). "In doing so, we examine the jury instructions as a whole to determine whether there is error requiring reversal. The instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Id.* Whether a duty exists also involves a question of law, which we consider de novo. *Dyer v Trachtman,* 470 Mich 45, 49; 679 NW2d 311 (2004).

At trial, plaintiff premised its negligence claims on Jimmy Zaremba's meetings with Musall in 2002, in which they discussed plaintiff's interest in "full, replacement coverage" for its building, the John Deere quotation, and the Marshall & Swift "appraisal."[2] Plaintiff advanced three theories of liability arising

---

[2] Plaintiff's counsel contended at oral argument that Jimmy and Musall had a separate and distinct conversation regarding replacement-value coverage in January 2003. This argument finds no support in the record.

from the 2002 encounters: (1) Musall negligently appraised the value of plaintiff's building as $496,000, which represented less than half the building's actual replacement value, (2) Musall negligently failed to procure the requested replacement-value coverage so that plaintiff would be "fully insured," and (3) Musall negligently failed to advise plaintiff that the coverage contained in the Harco policy did not provide guaranteed "full replacement value" in the event of a catastrophic loss, but instead required Harco to pay only a defined limit of $525,000.

The parties agreed that *Harts* controlled plaintiff's ability to prosecute its negligence claims.[3] In *Harts*, our Supreme Court considered whether an insurance agent owes a duty to advise an insured regarding the adequacy of coverage. *Harts*, 461 Mich at 2. "[U]nder the common law, an insurance agent whose principal is the insurance company owes no duty to advise a potential insured about any coverage" because the agent's job consists merely of "present[ing] the product of his principal and tak[ing] such orders as can be secured from those who want to purchase the coverage offered." *Id.* at 8. In a footnote, the Supreme Court observed: "This limited role for the agent may seem unusually narrow, but it is well to recall that this is consistent with an insured's obligation to read the insurance policy and raise questions concerning coverage within a reasonable time after the policy has been issued. " *Id.* at 8 n 4, citing *Parmet Homes, Inc v Republic Ins Co,* 111 Mich App 140, 145; 314 NW2d 453 (1981).

Notwithstanding the general no-duty-to-advise rule, the Supreme Court concluded in *Harts* that "when an

---

[3] During a discussion of jury instructions, defense counsel stated: "But I can tell you, since we started, since this has been decided in '99, Harts runs the show. I mean, that's the case that says what we can do and can't do . . . ."

event occurs that alters the nature of the relationship between the agent and the insured," a special relationship may result, creating a duty on the part of the agent to advise an insured in some respect regarding insurance issues. *Harts*, 461 Mich at 10. The change in the agent-insured relationship becomes manifest when

> (1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured. [*Id.* at 10-11.][4]

When a special relationship exists, an agent assumes a duty to advise the insured regarding the adequacy of insurance coverage. *Id.* at 10-11.

At trial, defendants conceded that the jury could properly decide whether Musall had adequately advised plaintiff. A supplemental jury instruction modeled on the *Harts* special-relationship criteria, given without objection, began: "[G]enerally, an insurance agent has no duty to advise a potential insured about any insurance coverage. However, the existence of a special relationship between an agent and his insured will give rise to a duty to advise." The instruction continued by quoting the four *Harts* criteria for a special relationship, and concluded: "If you find that a special relationship existed between Plaintiff and Defendant Musall because of one or more of the four circumstances exists, then the law places upon Mr. Musall a duty to advise Plaintiff."

---

[4] In a footnote, the Supreme Court suggested that a request for "full coverage" might qualify as "an ambiguous request for coverage" that in certain circumstances could require clarification. *Harts*, 461 Mich at 11 n 11.

Although the jury determined that Musall and plaintiff shared a special relationship, we reject plaintiff's contention that this finding, standing alone, eliminated any claim of comparative fault associated with or arising from plaintiff's duty to read its insurance documents. Under *Harts*, an insurance agent may create a special relationship by engaging in conduct inconsistent with merely taking a customer's order. But we view as simply illogical the suggestion that an agent's decision to undertake additional responsibilities on behalf of an insured immunizes the insured from the consequences of its own negligence. The negligence of one party does not eliminate the legal requirement that an opposing party use ordinary care. See Mi Civ JI 10.04.

Further, the law applied in Michigan leaves no room to doubt that as a general rule, an insured must read his or her insurance policy. As the Supreme Court summarized in *Farm Bureau Mut Ins Co of Michigan v Nikkel*, 460 Mich 558, 567; 596 NW2d 915 (1999): " 'This court has many times held that one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.' " (Citation omitted.) In *Casey v Auto-Owners Ins Co*, 273 Mich App 388, 394-395; 729 NW2d 277 (2006), this Court similarly observed:

> It is well established that an insured is obligated to read his or her insurance policy and raise any questions about the coverage within a reasonable time after the policy is issued. Consistent with this obligation, if the insured has not read the policy, he or she is nevertheless charged with knowledge of the terms and conditions of the insurance policy.[5]

---

[5] This Court recognized in *Casey* a limited exception to the insured's duty to read the policy, which it described as the situation "when the insurer renews the policy but fails to notify the insured of a reduction in coverage." *Casey*, 273 Mich App at 395. In that circumstance, the insurer

In *Harts*, our Supreme Court specifically and favorably referred to this Court's decision in *Parmet Homes*, in support of the general rule that an agent has no responsibility to advise a customer regarding coverage. In *Parmet Homes*, the plaintiff filed suit seeking to recover fire loss benefits under a builder's risk policy. Shortly before the plaintiff's prior policy expired, the defendant, an independent insurance agency, had switched insurance companies to "better meet the needs of plaintiff." Some evidence demonstrated that the agent had not consulted the plaintiff about the change, but had simply mailed it a copy of the new policy with premium invoices bearing the new insurance company's name. While the plaintiff's former policy required reports of construction starts every 90 days, the new policy required notice of construction starts every 30 days. *Parmet Homes*, 111 Mich App at 143. The defendant insurance company denied coverage for a fire loss, relying on the 30-day notice provision. *Id.* at 143-144.

The plaintiff, insisting that it had not known that the defendant agent had changed insurers or that a new notice requirement applied, brought a negligence action against the agent. The plaintiff admitted, however, that it had never read the new policy. *Id.* at 144. The trial court instructed the jury as follows:

"Generally, . . . the law in Michigan places a duty upon an insured to read his insurance policy. It is for you to decide what a reasonably careful person would, or would not do under the circumstances which you find existed in this case. If you find that Parmet Homes acted reasonably in believing the policy to be a renewal of the [Insurance

remains bound to the earlier policy and is estopped from denying coverage "on the basis of the discrepancy between the current policy and the prior one that was not brought to the insured's attention." *Id.* That exception does not apply here.

Company of North America] policy, then Parmet Homes
does not have a duty to read the policy. If you find that a
reasonably careful person would have read his policy under
the circumstances which you find existed in this case, you
may consider this with respect to the plaintiff's conduct in
considering contributory negligence." [*Id.* at 144-145.]

The defendants objected to the instruction excusing the
plaintiff from reading the policy. *Id.* at 145. This Court
approved the instruction, however, because the "plain-
tiff presented evidence that it was led to believe" that
the new policy merely renewed the prior one, explaining
that no duty to read exists when "a policy is renewed
without actual notice to the insured that the policy has
been altered." *Id.*

In *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318,
319; 661 NW2d 248 (2003), this Court addressed the
application of comparative fault principles in a case
involving an allegation that an insurance agent negli-
gently failed to secure the coverage requested. The
defendant insurer in *Holton* argued that the plaintiffs'
comparative negligence caused the fire that ultimately
led to an insurance loss. *Id.* at 320. This Court framed
the issue as "whether a defendant insurer is entitled to
an allocation of fault for conduct in an underlying
property loss, when a plaintiff seeks recovery for a
shortfall in insurance coverage on the basis of the
insurer's negligence in procuring insurance." *Id.* at 321.
The Court held that "the provisions for comparative
negligence" generally apply in a tort-based action
brought against an insurance agent, but that the plain-
tiffs' alleged negligence in starting the fire had no
relevance to a comparative fault analysis, given that the
"[d]efendants have proffered no evidence showing that
plaintiffs' or the contractor's alleged negligence in
causing the fire is a factor in whether the resulting
property damage would be covered under plaintiffs'

homeowner's insurance, which defendants allegedly failed to provide." *Id.* at 323-325.[6] Notably, the *Holton* Court specifically cited MCL 600.2957(1) and MCL 600.6304(1) as authority for its conclusion that the plaintiffs' action was "tort-based." *Id.* at 323-324.

Pursuant to MCL 600.6304, a jury must consider comparative fault if any fault is attributable to the plaintiff. MCL 600.6304 provides:

> (1) In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death involving fault of more than 1 person, including third-party defendants and nonparties, the court, unless otherwise agreed by all parties to the action, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:
>
> (a) The total amount of each plaintiff's damages.
>
> (b) The percentage of the total fault of all persons that contributed to the death or injury, including each plaintiff and each person released from liability under [MCL 600.2925d], regardless of whether the person was or could have been named as a party to the action.
>
> (2) In determining the percentages of fault under subsection (1)(b), the trier of fact shall consider both the nature of the conduct of each person at fault and the extent of the causal relation between the conduct and the damages claimed.[7]

The statute defines "fault" as including "an act, omission, conduct, including intentional conduct, a breach of

---

[6] In *Holton*, this Court did not address the insured's duty to read the policy.

[7] In MCL 600.2957(1), the Legislature provided:

> In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to [MCL 600.6304], in direct proportion to the person's percentage of fault.

warranty, or a breach of a legal duty, or any conduct that could give rise to the imposition of strict liability, that is a proximate cause of damage sustained by a party." MCL 600.6304(8).

The doctrine of comparative fault requires that every actor exercise reasonable care. *Hierta v Gen Motors Corp (On Rehearing)*, 196 Mich App 20, 23; 492 NW2d 738 (1992). "The general standard of care for purposes of comparative negligence, while differing in perspective, is theoretically indistinguishable from the applicable standard for determining liability in common-law negligence: the standard of conduct to which one must conform for his own protection is that of 'a reasonable [person] under like circumstances.' " *Lowe v Estate Motors Ltd*, 428 Mich 439, 455-456; 410 NW2d 706 (1987) (citation omitted). The question of a plaintiff's negligence for failure to use due care is a question for the jury unless no reasonable minds could differ or the determination involves some ascertainable public policy considerations. *Rodriguez v Solar of Michigan, Inc*, 191 Mich App 483, 488; 478 NW2d 914 (1991).

Because plaintiff's negligence claims in the instant case are tort-based, we conclude that the plain language of MCL 600.6304 and MCL 600.2957 required the trial court to give defendants' requested instruction regarding comparative negligence. We additionally conclude that plaintiff's admitted failure to read the policy could qualify as comparative negligence and that the trial court should have permitted the jury to consider whether plaintiff unreasonably failed to read the 2002-2003 policy, the 2002 application, and the 2003-2004 insurance quotation. We now apply these legal principles to plaintiff's liability theories.

Plaintiff alleged that Musall negligently failed to procure the insurance coverage that plaintiff requested:

guaranteed replacement-value coverage for its building and contents. According to plaintiff, Musall also neglected to advise plaintiff that the policy purchased contained a defined limit rather than the "full replacement coverage" that plaintiff had specifically requested. Defendants correctly observe that if plaintiff had read its 2002-2003 policy, it would have easily ascertained that regardless of Musall's representations to the contrary, the policy clearly and unambiguously provided that the "most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations."

In light of plaintiff's legal duty to read its 2002-2003 insurance policy, a jury could have reasonably concluded that during the months between plaintiff's purchase of the 2002-2003 Harco policy and the February 2003 fire, plaintiff negligently failed to question Musall about its building coverage. Similarly, a jury could have reasonably determined that plaintiff should have discovered that the policy language contradicted Musall's representations regarding "full" and "guaranteed replacement value" coverage.[8] Furthermore, MCL 600.6304(1)(b) unambiguously requires the finder of fact to assess the percentage of fault attributable to a plaintiff if the plaintiff's fault constituted a proximate cause of the plaintiff's damages. "[U]nder [MCL 600.6304], if a defendant presents evidence that would allow a reasonable person to conclude that a plaintiff's negligence constituted a proximate cause of [the plaintiff's] injury and subsequent damage, the trier of fact must be allowed to consider such evidence in apportion-

---

[8] We reject plaintiff's contention that the policy lacked clarity or harbored ambiguity. On the contrary, the policy clearly stated a coverage limitation of $525,000. See *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 47-51; 664 NW2d 776 (2003).

ing fault." *Shinholster v Annapolis Hosp*, 471 Mich 540, 552; 685 NW2d 275 (2004). A jury could reasonably conclude that plaintiff's failure to read its 2002-2003 policy qualified as a proximate cause of its failure to obtain clarification regarding the Harco policy limits before the February 2003 fire.

In contrast, plaintiff's liability claims arising from Musall's negligent appraisal of its building do not logically lend themselves to a comparative negligence analysis. In addition to plaintiff's insufficient coverage claim, plaintiff contended that Musall negligently calculated the replacement value of its building. Plaintiff's policy and the related documents do not contain, however, any information that might have called into question the accuracy of the Marshall & Swift computation or Musall's allegedly negligent representation that plaintiff could replace its building within the limits of the policy. Thus, under the negligent appraisal theory of liability, plaintiff's own failure to read its insurance documents does not represent a proximate cause of its damages.

Plaintiff submitted all three of its negligence theories to the jury as a single unit, and the jury returned a general verdict finding negligence on defendants' part. Although our comparative negligence analysis applies to some but not all of plaintiff's negligence claims, we must nevertheless reverse the entire negligence verdict because it is impossible to determine which theories of negligence liability the jury adopted. *Tobin v Providence Hosp*, 244 Mich App 626, 645; 624 NW2d 548 (2001).

Finally, we reject plaintiff's claim that defendants "waived" a comparative negligence defense in this case by not including it as an affirmative defense in their first responsive pleading. Defendants' answer to plaintiff's amended complaint included the following affir-

mative defense: "Plaintiff has a duty to read the insurance policy and raise questions within a reasonable time. It cannot claim it was defrauded if it has the policy in its possession because of its precedent duty. It cannot claim estoppel because it should know what the policy covers." Defendants included similar language in their initial answer. Defendants also brought at least two motions for summary disposition, asserting that plaintiff had a duty to read its policy, and defendants requested a jury instruction delineating this duty, as well as an instruction regarding comparative negligence. Defendants' failure to specifically label the duty to read defense as a comparative negligence defense should not prevent them from defending on that basis, as they attempted to do throughout the proceedings. *Meridian Mut Ins Co v Mason-Dixon Lines, Inc (On Remand)*, 242 Mich App 645, 648; 620 NW2d 310 (2000). Additionally, defendants' failure to specifically label plaintiff's duty to read the policy as an affirmative defense did not foreclose the trial court from properly instructing the jury regarding comparative fault.

In summary, we hold that when an insurance agent elects to provide advice regarding coverage and policy limits, the agent owes a duty to exercise reasonable care. The insured has a duty to read its insurance policy and to question the agent if concerns about coverage emerge. A jury should consider these corresponding duties in the crucible of comparative negligence.

B. SPECIAL INSTRUCTION 4(c)

Defendants next contend that the trial court erred when it submitted to the jury special instruction 4(c), which described one of Musall's duties as follows: "The duty to properly procure and place insurance coverage on the Property so that the Policy would meet or exceed

all of [plaintiff's] expectations regarding such coverage[.]" Defendants argue that this instruction embodied a "rule of reasonable expectations," which the Michigan Supreme Court specifically disapproved in *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51-63; 664 NW2d 776 (2003).

The rule of reasonable expectations permits a court to construe an insurance contract in a manner contradicted by its unambiguous terms. As described by Professor Keeton, this rule provides that the "objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Keeton, *Insurance law rights at variance with policy provisions*, 83 Harv L R 961, 967 (1970). In *Wilkie*, our Supreme Court rejected any notion that the rule of reasonable expectations, even "objectively reasonable ones," applies in Michigan: "The rule of reasonable expectations clearly has no application to unambiguous contracts. That is, one's alleged 'reasonable expectations' cannot supersede the clear language of a contract." *Wilkie*, 469 Mich at 60.

Contrary to defendants' argument here, the analysis in *Wilkie* did not require that the trial court eliminate special instruction 4(c). *Wilkie* applies to the *construction* of insurance contracts, rather than the duties attendant to the *procurement* of insurance contracts. The cases overruled in *Wilkie*, such as *Powers v DAIIE*, 427 Mich 602; 398 NW2d 411 (1986), also involved the construction of contractual language, rather than a determination whether an agent properly procured the coverage requested by the insured.

An insurance agent owes a duty to procure the insurance coverage requested by an insured. *Khalaf v*

*Bankers & Shippers Ins Co*, 404 Mich 134, 142-143; 273 NW2d 811 (1978); *Haji v Prevention Ins Agency, Inc*, 196 Mich App 84, 87; 492 NW2d 460 (1992). "The insured's agent must strictly follow the insured's instructions which are clear, explicit, absolute, and unqualified." 3 Couch, Insurance, 3d, § 46.28, p 46-33. Special jury instruction 4(c) addressed Musall's duty to procure the coverage plaintiff sought. It did not dictate any manner of construing the words within plaintiff's insurance policy, the issue resolved by our Supreme Court in *Wilkie*.

Nevertheless, special instruction 4(c) incorrectly stated the law. Musall had no duty to procure coverage that would "meet or exceed all of [plaintiff's] expectations." Instead, the law only required Musall to procure the coverage actually ordered by plaintiff. Plaintiff's expectations might be relevant to this duty, but no recognized legal authority supports the portion of the instruction given that concerned meeting or exceeding plaintiff's expectations. Therefore, on remand, the court should not give this specific portion of the instruction to the jury.

### III. CHALLENGES TO THE FRAUD AND INNOCENT MISREPRESENTATION VERDICTS

Defendants next contend that plaintiff's failure to read the policies eliminates plaintiff's claims for fraud and innocent misrepresentation. In support of this argument, defendants rely principally on *Nieves v Bell Industries, Inc*, 204 Mich App 459, 464; 517 NW2d 235 (1994), in which this Court observed: "There can be no fraud where a person has the means to determine that a representation is not true."

To establish a prima facie case of fraud, a plaintiff must prove that (1) the defendant made a material

representation, (2) the representation was false, (3) the defendant knew that it was false when it was made, or made it recklessly, without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that the plaintiff would act on it, (5) the plaintiff acted in reliance on it, and (6) the plaintiff suffered injury because of that reliance. *Hord v Environmental Research Institute of Michigan (After Remand)*, 463 Mich 399, 404; 617 NW2d 543 (2000). This Court has frequently reiterated that, to sustain a fraud claim, the party claiming fraud must *reasonably* rely on the material misrepresentation. See *Foreman v Foreman*, 266 Mich App 132, 141-142; 701 NW2d 167 (2005) (holding that the plaintiff had to "show that any reliance on defendant's representations was reasonable"); see also *Bergen v Baker*, 264 Mich App 376, 389; 691 NW2d 770 (2004).

An innocent misrepresentation claim requires proof that (1) the defendant made a material representation, (2) the representation was false, (3) the defendant made it with the intention of inducing reliance by the plaintiff, (4) the plaintiff acted in reliance on the representation, and (5) the plaintiff thereby suffered an injury that benefited the defendant. *State-William Partnership v Gale*, 169 Mich App 170, 178; 425 NW2d 756 (1988). Reasonable reliance also must exist to support claims of innocent misrepresentation. *Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 690-691; 599 NW2d 546 (1999).

Defendants argue that because the insurance documents previously provided to plaintiff stated a definite coverage limit of $525,000 applicable to plaintiff's building, plaintiff could not have reasonably relied on Musall's representations in 2001 or 2002 that the policy provided full replacement coverage. We agree that if

plaintiff had read the clear and unambiguous 2002 policy language, it would have learned that the policy did not provide unlimited replacement value coverage for the building, but had a defined limit of $525,000. Furthermore, because the record reflects no further discussions between the parties regarding the $525,000 policy limit, see note 2 of this opinion, we agree with defendants that as a matter of law, plaintiff cannot prevail on a fraud or innocent misrepresentation theory premised on Musall's representations regarding the policy limits. Under the circumstances of this case, plaintiff had the means to determine the truth or falsity of Musall's representations. But because plaintiff's fraud and innocent misrepresentation claims sound in tort, MCL 600.6304 compels the conclusion that a jury must decide whether plaintiff's failure to read the policy constituted a proximate cause of its damages.[9]

However, our resolution of this aspect of plaintiff's fraud and innocent misrepresentation claims does not end our inquiry. As noted previously, plaintiff's fraud and innocent misrepresentation claims also encompassed Musall's statements regarding the accuracy of the Marshall & Swift computation and whether plaintiff could actually replace its building for $525,000. Neither the policy language nor any documents provided by defendants regarding the policy would have shed light on the accuracy of the Marshall & Swift estimate or Musall's representation that the $525,000 coverage limit constituted adequate replacement coverage. Therefore, the record could support plaintiff's claims that Jimmy reasonably relied on Musall to accu-

[9] "In determining the percentages of fault under subsection (1)(b), the trier of fact shall consider both the nature of the conduct of each person at fault and the extent of the causal relation between the conduct and the damages claimed." MCL 600.6304(2); see also *Holton,* 255 Mich App at 323-326.

rately evaluate the cost of replacing the building and also reasonably relied on Musall's representation that the Marshall & Swift calculation constituted a reasonable assessment of the building's replacement cost. But because the verdict form did not distinguish between the proper and improper theories of fraud and innocent misrepresentation submitted to the jury, a new trial is required on the remaining fraud and innocent misrepresentation theories. *Tobin,* 244 Mich App at 645-646.

IV. PROMISSORY ESTOPPEL

The elements of a promissory estoppel claim consist of (1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided. *Booker v Detroit,* 251 Mich App 167, 174; 650 NW2d 680 (2002), rev'd in part on other grounds 469 Mich 892 (2003). " 'A promise is a manifestation of intention to act or refrain from acting in a specific way, so made as to justify a promisee in understanding that a commitment has been made.' " *State Bank of Standish v Curry,* 442 Mich 76, 85; 500 NW2d 104 (1993) (citation omitted). The promise must be definite and clear, and the reliance on it must be reasonable. *Ypsilanti Twp v Gen Motors Corp,* 201 Mich App 128, 134; 506 NW2d 556 (1993). This Court has held that no action for promissory estoppel may lie when an oral promise expressly contradicts the language of a binding contract. See *Novak,* 235 Mich App at 687.

We agree with defendants that the trial court erred by permitting the jury to consider plaintiff's promissory estoppel claim. Plaintiff failed to identify any promises made by Musall beyond those contained in the insur-

ance policy. Furthermore, Musall's alleged representations that plaintiff had "full coverage" or "replacement cost coverage" were not promises, but "words of assurance or statements of belief . . . ." *State Bank of Standish,* 442 Mich at 90. Therefore, on retrial, plaintiff may not submit a promissory estoppel claim to the jury.

## V. EXPERT TESTIMONY REGARDING MUSALL'S DUTIES

Defendants next assert that the trial court erred by denying their motion for judgment notwithstanding the verdict based on plaintiff's failure to offer expert testimony regarding the standard of care owed by Musall. According to defendants, because Musall was a licensed professional at the time of his actions and omissions relevant to this case, plaintiff could establish the standard of care required only through the introduction of expert testimony provided by a similarly licensed professional. In support of this argument, defendants cite several cases from other jurisdictions and one unpublished Michigan case, *Nofar v Eikenberry,* unpublished memorandum opinion of the Court of Appeals, issued October 30, 1998 (Docket No. 197231).

This Court reviews de novo a trial court's decision to deny a motion for judgment notwithstanding the verdict. *Attard v Citizens Ins Co of America,* 237 Mich App 311, 321; 602 NW2d 633 (1999). The determination whether the nature of a claim involves ordinary negligence or professional negligence is also subject to review de novo. *Bryant v Oakpointe Villa Nursing Ctr, Inc,* 471 Mich 411, 419; 684 NW2d 864 (2004).

Aside from the unpublished *Nofar* memorandum opinion,[10] Michigan's appellate courts have not consid-

---

[10] Pursuant to MCR 7.215(C)(1), an unpublished opinion has no precedential value. However, this Court may follow an unpublished

ered the necessity of expert testimony in cases alleging negligence on the part of an insurance agent. In *Nofar*, the trial court directed a verdict for the defendants on the negligence claim because the plaintiff failed to present expert testimony regarding an insurance agent's breach of the standard of care. This Court affirmed, explaining that

> [p]laintiffs failed to present any evidence as to the standard of care applicable to insurance professionals. The complaint alleged that although defendants first bound coverage on the building, they notified plaintiffs prior to the accident that they exceeded their authority, but would try to obtain alternative coverage. The complaint alleged that this conduct was negligent and below the standard of care for professional licensed insurance agents. Where plaintiffs failed to support this allegation with any evidence as to the proper standard of care, the trial court correctly granted a directed verdict as to the negligence count. [*Nofar*, p 2.]

The Court observed elsewhere in *Nofar* that "[w]here the lack of professional care is so manifest that it would be within the common knowledge and experience of laypersons, expert testimony is not required." *Id.*

In other jurisdictions, a split of authority exists regarding the necessity of expert testimony in insurance agent negligence cases. Generally, the opinions focus on the underlying duty allegedly breached by the agent and evaluate whether the duty inherently involved the exercise of professional skills likely to fall outside the common understanding of lay jurors. For example, *Atwater Creamery Co v Western Nat'l Mut Ins Co*, 366 NW2d 271 (Minn, 1985), considered a claim that an insurance agent negligently failed to notice an insured's gap in coverage and to determine whether

opinion if it finds the reasoning persuasive. See *Slater v Ann Arbor Pub Schools Bd of Ed*, 250 Mich App 419, 432; 648 NW2d 205 (2002).

insurance was available to fill that gap. The plaintiff had not requested that the agent review the coverage, but asserted the existence of an independent duty to do on the basis of their 17-year relationship. *Id.* at 279. The Minnesota Supreme Court held that the standard of care required of the agent had to be established through expert testimony because the claimed deficiency in his performance centered on the "professional judgment of the agent in the absence of requests for action . . . ." *Id.*

In *Humiston Grain Co v Rowley Interstate Transportation Co, Inc*, 512 NW2d 573, 575 (Iowa, 1994), the Iowa Supreme Court observed that "[b]ecause insurance agents are professionally engaged in transactions ranging from simple to complex, the requirement of expert testimony varies from jurisdiction to jurisdiction depending on the nature of the alleged negligent act." When an agent fails to procure the coverage requested, expert testimony is generally unnecessary because this circumstance can be "commonly understood by laypersons . . . ." *Id.* On the other hand, cases involving an "agent's alleged failure to discern coverage gaps or risks of exposure in more complex business transactions" may necessitate expert testimony. *Id.* The court ruled in *Humiston Grain* that expert testimony was required to prove that the defendant agent had overlooked the plaintiff's subrogation rights despite the absence of a specific request for information on this subject. *Id.* at 575-576.

We agree with the analyses in *Atwater Creamery* and *Humiston Grain* that the need for expert testimony in an insurance coverage case should be determined on a case-by-case basis and depends on the nature of the underlying claims of negligence raised against the agent. If the duty alleged to have been breached falls

beyond the understanding of the average juror, a trial court may require that the party alleging negligence produce expert testimony supporting the claim. This is entirely consistent with longstanding Michigan caselaw holding that when the claimed negligence involves " 'a matter of common knowledge and observation,' " no expert testimony is required. *Daniel v McNamara*, 10 Mich App 299, 308; 159 NW2d 339 (1968) (citation omitted). Indeed, "while expert testimony is the traditional and the preferred method of proving medical malpractice, exceptions to the need for expert testimony have been recognized." *Locke v Pachtman*, 446 Mich 216, 230; 521 NW2d 786 (1994).

Plaintiff's negligence claims against Musall included (1) misrepresentation of coverage terms, (2) miscalculation of the building replacement costs, (3) failure to advise plaintiff that the policy did not include "full replacement coverage," and (4) failure to provide plaintiff with "clear and accurate advice" in response to plaintiff's request for replacement value coverage. We conclude that proof of these allegations does not require expert testimony. The law required Musall to accurately represent the nature and extent of the coverage. Whether he breached this duty constitutes a question of fact that the jury could answer on the basis of the jurors' common knowledge and ordinary experiences. Similarly, an average juror possesses the capability of deciding whether Musall provided plaintiff with "clear and accurate advice" regarding the replacement value coverage or instead failed to advise plaintiff that its coverage would not suffice to replace its building.

If plaintiff had asserted that Musall's standard of care required a certain type of appraisal or a referral for a professional appraisal, or any other specific action, expert testimony might be necessary. Here, however,

plaintiff alleged that Musall voluntarily elected to per-
form an appraisal and provided plaintiff with an incor-
rect building value. Defendants never claimed that the
value Musall selected represented the correct cash
value of the premises or the replacement value. Instead,
defendants argued that the Marshall & Swift figure was
only a "cost estimate," and not an appraisal. Plaintiff's
negligence allegations premised on the miscalculated
building value may be easily and readily understood by
a lay juror; the record evidence reveals that Musall's
miscalculation occurred in part because he applied an
incorrect measure of the building's square footage to
the Marshall & Swift calculation. The miscalculation
issue thus presented relatively simple questions of fact,
rather than questions concerning the scope of standard
of care required of Musall. Musall vehemently denied
that he used the Marshall & Swift estimate to appraise
the building. If the jury had instead believed that
Musall intended the Marshall & Swift calculation to
serve as an appraisal, expert testimony would not have
aided the determination of whether Musall acted negli-
gently.

The dissent argues that "significant questions" re-
garding Musall's conduct "fell far outside" a layperson's
knowledge. *Post* at 51. We reiterate that, in our view,
this record contains no such questions. Musall admitted
that he undertook the Marshall & Swift calculation to
assist plaintiff and claimed that he repeatedly advised
Jimmy that the Marshall & Swift value did not consti-
tute an appraisal. Jimmy denied this and testified that
Musall vouched for the accuracy and reliability of the
Marshall & Swift calculation. The jury believed Jimmy,
not Musall. No expert witness could have added any-
thing pertinent to the dispute between the two parties
regarding the content of their conversation. Further-
more, the trial court considered defendants' posttrial

claim that expert testimony would have assisted the jury in deciding whether Musall had been negligent and rejected it pursuant to the following logic:

> There was ample evidence to support the negligence claim, and . . . I hate to disparage the man, but I felt it was so obvious that he did an extremely negligent job as an agent. It was so obvious I'm not sure expert testimony would have either, number one, [been] needed or would have added anything that wasn't so patently obvious. And I don't know if the transcript will convey that, but it should.

On retrial, however, should the court conclude that expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," it certainly remains free to permit the testimony, in accordance with MRE 702.

### VI. PLAINTIFF'S USE OF LETTERS REGARDING SETTLEMENT

Defendants next contend that the trial court erroneously permitted plaintiff to introduce into evidence "dozens" of presuit letters written by plaintiff's counsel that contained information regarding settlement demands and settlement negotiations. Defendants challenge the letters as constituting hearsay not permitted by any exception to the rule against hearsay and as inadmissible evidence of settlement negotiations under MRE 408.

This Court reviews for an abuse of discretion a trial court's decision to admit evidence. *Barnett v Hidalgo*, 478 Mich 151, 158-159; 732 NW2d 472 (2007). The abuse of discretion standard recognizes " 'that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome.' " *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809

(2006) (citation omitted). An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes. *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006).

Our review of the letters and their use during the trial reveals that plaintiff employed multiple items of correspondence between the parties to prove that defendants delayed paying claims that were not reasonably in dispute, in violation of MCL 500.2006, and that the violation entitled plaintiff to 12 percent statutory penalty interest. Although the trial court submitted this issue to the jury without objection, the parties later agreed that the court should have decided it. The trial court independently affirmed the jury's verdict in a separate posttrial order.

The letters referred to ongoing settlement negotiations, the need for additional information to resolve various claims, requests by plaintiff for additional and faster payments, and recapitulated previous events. But MRE 408 provides, in relevant part:

> This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Because the rule explicitly contemplates the admissibility of evidence of settlement-related discussions for the purpose of "negativing a contention of undue delay," it logically follows that evidence of settlement discussions may also qualify as admissible to *prove* undue delay.

Defendants' hearsay argument has greater merit. Although plaintiff contends that it did not offer the

letters to prove the truth of the matters asserted in them, plaintiff's counsel vigorously argued regarding the substance of the letters during the trial. These arguments, however, related only to plaintiff's claim for penalty interest, and on appeal defendants have not challenged the propriety of the trial court's entry of that portion of the judgment awarding penalty interest. Consequently, any error attending the introduction of the letters qualifies as harmless. MCR 2.613(A) ("An error in the admission or the exclusion of evidence . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."); MRE 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . .").

It appears unlikely that the challenged letters will be relevant on retrial. Hearsay evidence contained in the letters may be offered on retrial for a purpose other than "to prove the truth of the matter asserted" as long as that purpose bears relevance to the underlying claims and defenses of the parties. MRE 401; MRE 801(c). But we cannot envision how, and we find it highly unlikely that, the letters might make the existence of Musall's negligence, or the existence of fraud or innocent misrepresentation, more probable than these matters would be without the letters in evidence. MRE 401.

### VII. PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT, RECOVERY OF INSURANCE PREMIUMS, AND PENALTY INTEREST

On appeal, defendants have failed to brief any legal challenges to the jury's awards regarding plaintiff's claims of breach of contract, recovery of insurance

premiums, and penalty interest. Because defendants have neglected to brief any issues criticizing the jury's verdicts on these claims, they have abandoned any legal challenges to these verdicts. *Dep't of Transportation v Initial Transport, Inc*, 276 Mich App 318, 334; 740 NW2d 720 (2007), rev'd in part on other grounds 481 Mich 862, 863 (2008). We therefore affirm the judgment entered with regard to the jury awards concerning plaintiff's claims of breach of contract, recovery of insurance premiums, and penalty interest claims.

### VIII. SUMMARY

We affirm the judgment in favor of plaintiff regarding its claims of breach of contract, recovery of insurance premiums, and penalty interest. We reverse the judgment in favor of plaintiff on its claims of negligence, fraud, and innocent misrepresentation and remand this case for a new trial of these claims consistent with this opinion. We also reverse and vacate the judgment in favor of plaintiff for promissory estoppel and vacate the trial court's order granting case evaluation sanctions and prejudgment and postjudgment interest. We do not retain jurisdiction.

BORRELLO, J., concurred.

O'CONNELL, P.J. (*concurring in part and dissenting in part*). I concur with the majority opinion in all respects except for its determination that an expert witness was not required for the negligence claim. I do not disagree with the conclusion that whether expert testimony is required must be determined on a case-by-case basis; I disagree with the conclusion that it was not necessary in this case.

To the extent that the question before a jury is whether the insurance agent did not provide the type of coverage requested, I agree that no expert testimony is necessary. But, to the extent that the issues go beyond such simple questions, expert testimony is required. See *Humiston Grain Co v Rowley Interstate Transportation Co, Inc*, 512 NW2d 573, 576 (Iowa, 1994) ("[W]here an insurance agent is alleged to have breached a professional duty, if the error or omission extends beyond the agent's mere failure to procure coverage requested and paid for by the client, proof of the standard of care applicable to the circumstances must be established by expert testimony."); *Atwater Creamery Co v Western Nat'l Mut Ins Co*, 366 NW2d 271, 279 (Minn, 1985) (holding that expert testimony was required to establish standard of care because "the issue center[ed] around the professional judgment of the agent in the absence of requests for action"); *Todd v Malafronte*, 3 Conn App 16, 19; 484 A2d 463 (1984) ("Insofar as the sale of insurance requires specialized knowledge, we agree that this case differs from the ordinary negligence action since matters within that specialized body of knowledge are crucial to the determination of the issues raised.").

In the present case, there were significant questions that the jury needed to answer that fell far outside a layperson's general knowledge. Was it reasonable or standard practice for an agent to use the Marshall & Swift calculation? Do/should agents generally voluntarily elect to perform the calculation; should they? Do/should agents generally explain to the insured that such a calculation is not an appraisal value; should they? Does/should an agent generally recommend that an insured seek an independent appraisal? Given that terms in insurance contracts often have meanings separate and apart from their common meaning, do agents

have a responsibility to explain what various terms, such as "replacement value," mean? To what extent should agents explain the terms and limitations of a policy to an insured? How often? These are matters of specialized knowledge that require an expert to help the jury with its fact-finding. Like the plaintiff in *Nofar v Eikenberry*, unpublished memorandum opinion of the Court of Appeals, issued October 30, 1998 (Docket No. 197231), p 2, plaintiff "failed to present any evidence as to the standard of care applicable to insurance professionals." Reversal is required.

Because we are remanding this case to the trial court for a new trial on the negligence claim, albeit for a different reason, I concur in the result.[1]

---

[1] I concur with the majority opinion that the settlement letters are not admissible on retrial.