*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

WEST LANSING RETAIL DEVELOPMENT, LLC,

   Plaintiff-Counterdefendant-Appellant,

v

KRIS KRSTOVSKI and K2 RETAIL
CONSTRUCTION SERVICES, INC.,

   Defendants-Cross-Defendants-
   Appellees,

and

UNIFIED GROUP, LLC,

   Defendant-Counterplaintiff-Cross-
   Plaintiff-Appellee.

UNPUBLISHED
November 9, 2023

No. 365181
Eaton Circuit Court
LC No. 2022-000906-CB

---

K2 RETAIL CONSTRUCTION SERVICES, INC.,

   Plaintiff-Counterdefendant-Appellee,

v

WEST LANSING RETAIL DEVELOPMENT, LLC,

   Defendant-Cross-Defendant-
   Appellant

and

UNIFIED GROUP, LLC,

   Defendant-Counterplaintiff-Cross-
   Plaintiff-Third-Party Plaintiff-
   Appellee,

No. 365183
Eaton Circuit Court
LC No. 2022-000907-CB

and

ROHR GASOLINE EQUIPMENT, INC.,

> Defendant-Third-Party Defendant,

and

KRIS KRSTOVSKI,

> Third-Party Defendant-Appellee.

Before: GLEICHER, C.J., and JANSEN and RICK, JJ.

PER CURIAM.

The dissolution of business relationships can be complicated. This is especially true in large construction and development projects that involve interwoven corporations, investors, contractors, and subcontractors. Here, the entity formed to hold the real property for a large multi-use development stopped paying the general contractor, which was also the entity that initiated the project. No payment meant that the general contractor lacked liquid assets to purchase the real property in a receivership action and lost out to the property holder. The general contractor eventually won its battle, however, by filing a construction lien and securing a court order of subrogation after the property holder breached the purchase agreement with the landowner.

We are asked to overturn the subrogation order and order summary disposition in the land holder's favor. However, we discern no error on the circuit court's part and affirm.

## I. BACKGROUND

In 2019, Kris Krstovski, as "manager" of West Lansing Retail Development, LLC (WLRD), signed a purchase agreement with Unified Group, LLC (UG) to purchase a total of 207 acres in six phases through August 2023, on which he would develop Delta Crossings, a mixed-use development. Krstovski is also the managing partner of K2 Retail Construction Services, LLC (K2), which served as the general contractor for the development. Krstovski invited a handful of investors to join the project and the individuals created a hodgepodge of corporate entities connected to the development. WLRD remained the entity tasked with purchasing the property phases by dates set within the purchasing agreement. WLRD timely purchased Phases I and II and development of those phases was nearly complete when disputes arose among the investors. Although WLRD had yet to purchase the remaining phases, K2 had already made improvements that crossed parts of Phases III and IV, including installing a road, underground utilities, and a retention pond.

Between late 2021 and mid-2022, the individual investors, corporate entities, and subcontractors filed several lawsuits against each other in Oakland Circuit Court, some of which are still ongoing. In relevant part, the other investors accused Krstovski of mismanaging finances.

-2-

Krstovski accused the others of wrongfully withholding payments for completed and ongoing construction and development. Only one of the Oakland County cases has made its way into the current record. In *LIP West Lansing, LLC v Krstovski*, Oakland Circuit Court Docket No. 2022-193988-CB, the court appointed a receiver "to take possession, custody, and control of" K2-LIP JV West Lansing, LLC, West Lansing Retail Phase I, LLC, and West Lansing Retail Phase II, LLC "including their property and affairs," which included the real property of Phases I and II but not Phases III through VI. Krstovski was ordered to "turn over" "all documents, books, records and computer files, computer equipment, software, management files, . . . and all passwords" "pertaining to the Receivership Property." Krstovski complied.

The receiver auctioned off the receivership property. Krstovski (through K2) competed with WL Acquisitions (the successor of WLRD without Krstovski as a member) for the right to purchase. WL/WLRD entered the winning bid of $1,050,000; Krstovski offered $1 million plus an additional $1,200,000 credit bid that was rejected. The order of sale entered September 8, 2022. Three days later, K2 filed a claim of lien for $1,028,793.62 "for work relating to Phases III, IV and V of Delta Crossings," to cover improvements that had been made to the land without remuneration. K2 cited September 9 as the its last day of work.

WL/WLRD was required to purchase an additional phase of the property by August 17, 2022. It missed that window. The purchase agreement created a 30-day grace period, but WL/WLRD missed that deadline as well. WL/WLRD indicated that it would not purchase the next phase with K2's cloud on the title and demanded that UG clear it. UG refused and terminated the purchase agreement.

In the meantime, both WLRD and K2 filed the current lawsuits in the Eaton Circuit Court. In the case underlying Docket No. 365181, WLRD accused K2 of wrongfully inflating the amount of the construction lien to interfere with WLRD's ability to perform under the purchase agreement. In the case underlying Docket No. 365183, K2 originally sought foreclosure of its construction lien against WLRD, UG, and a third defendant that is not party to this appeal. After UG terminated the purchase agreement with WLRD for nonpayment, K2 filed a motion "to subrogate WLRD and perform the Purchase Agreement with" UG pursuant to MCL 570.1107(4) of the Construction Lien Act, MCL 570.1101 *et seq.* (CLA). If granted, this would allow K2 an additional 30 days to purchase the next phase of the Delta Crossings development from UG.

MCL 570.1101(1) of the CLA grants contractors, subcontractors, suppliers, and laborers a construction lien against real property to which they have made improvements to secure payment for their work. The general method of recovery for nonpayment is foreclosure as provided in MCL 570.1101(3). The alternative remedy of subrogation and performance is provided in MCL 570.1101(4) as follows:

> If the rights of a person contracting for an improvement as a land contract vendee or a lessee are forfeited, surrendered, or otherwise terminated, any lien claimant who has provided a notice of furnishing or is excused from providing a notice of furnishing under [MCL 570.1108, MCL 570.1108a, or MCL 570.1109] and who performs the covenants contained in the land contract or lease within 30 days after receiving actual notice of the forfeiture, surrender, or termination *is subrogated to*

*the rights of the contracting vendee or lessee as those rights existed immediately before the forfeiture, surrender, or termination.* [Emphasis added.]

The Eaton Circuit Court took argument on the subrogation issue in November 2022. The court summarized the issues then before it as whether K2's lien was valid and whether the purchase agreement was actually terminated. WLRD's counsel agreed with this statement. The court determined that there remained a question of fact regarding when K2 actually stopped working—when a stop work order entered in May 2022 or on September 9, 2022 as claimed in the lien. The validity of the lien was "such a critical fact" that the questions of subrogation and WLRD's responsive motion for summary disposition could not be decided without an evidentiary hearing. UG then argued that before the court could permit K2's subrogation under the contract, it had to determine that the purchase agreement had been terminated. This was a question of law for the court to decide based on the contractual language, UG contended. In response to the court's inquiry, UG asserted that it had no duty to clear a lien based on unpaid construction costs as anything related to construction on and improvement to the property was WLRD's responsibility, not the seller's. K2 was WLRD's agent, UG had no part in that relationship and could not be responsible for WLRD failing to pay its own contractors. The court ultimately determined it would schedule "an evidentiary hearing on the validity of the lien," and noted, "I believe that will allow me to do - - to make other decisions." However, the court subsequently stated that the "sole issue" for the hearing was the validity of the lien.

The court conducted a two-day evidentiary hearing to consider the validity of K2's lien in response to the subrogation motion. The court heard extensive testimony from the former K2 project manager (James Cisek), Krstovski, and UG's managing partner (Jonathan Eyde). The witnesses described in great detail the work performed on Phases I and II, as well as work performed on the other phases that had yet to be purchased. The witnesses more generally discussed the flow of money for the project, or lack thereof, and bills that remained unpaid. WLRD presented no witnesses of its own.

At the close of the hearing, the court stated, "I'm not sure if the amount of the lien is accurate." If the action were one of foreclosure, the court noted, this would prevent recovery. As the relief sought was subrogation, however, the court was only required to determine if the lien was valid. The court found that K2 had performed work on Phase III that "benefitted" the property and was "an improvement." The court also found that Krstovski had authority to perform the work and had only stopped work on September 9, 2022, within the timeline contemplated by the CLA.[1] Accordingly, the court ruled, "I think there's a valid lien; I'm not sure about the amount, but I think it's irrelevant" as Krstovski would "be allowed to subrogate and close on the property." The court continued, "I don't have to care about how much the lien is because the lien is gonna be dissipated upon the completion of the sale."

K2 was prepared with a draft order for the court. WLRD objected to certain language in that order; specifically, that the purchase agreement was terminated. The court chastised WLRD

---

[1] MCL 570.1111(1) provides that a contractor's right to a construction lien "shall cease to exist unless, within 90 days after the lien claimant's last furnishing of labor or material for the improvement, pursuant to the lien claimant's contract," the claimant files its lien.

-4-

for failing to present any witnesses to testify that the purchase agreement was not properly terminated for its failure to purchase the next phase. The court ruled, "I believe the contract was terminated based on what I have on the record today and the exhibits that WLRD was obligated to complete it by, I think it was August 17th. They were provided written notice that they were in default, they didn't cure it and on September 20th, [UG] notified WLRD that it was in default and terminating the purchase agreement."

WLRD further objected that the evidentiary hearing only pertained to the validity of K2's lien and that the issue of subrogation required an additional hearing. The court responded that the validity of the lien resolved that subrogation was proper.

WLRD sought reconsideration of the court's subrogation order, contending that the court was required to ascertain the true amount of the lien in considering its validity and that the court erred in finding that WLRD breached the purchase agreement when it had not taken any evidence on that issue. The circuit court denied WLRD's motion. Although WLRD argued that K2 fraudulently inflated the value of the lien, the court determined that this would only be relevant if K2 sought to foreclose. Subrogation, unlike foreclosure, required the court to find that there was a valid lien and that the purchase agreement had been terminated. "For the lien to be valid, the Court needed to determine that K2 had performed work pursuant to a contract within ninety (90) days of filing the Lien" pursuant to MCL 570.1111. And the court declined to reiterate on the record the reasons it found the lien valid.

In the meantime, K2 followed through and purchased the next phase of the development from UG. Thereafter, WLRD admitted that all of its claims but one were adjudicated by the court's determination that K2 held a valid lien. K2 sought summary disposition of that final claim: tortious interference with a contract. WLRD argued that K2 intentionally inflated the amount of its lien to interfere with WLRD's ability to perform its duties under the purchase agreement with UG. K2 contended that WLRD improperly conflated the elements of tortious interference with a contract with the elements of tortious interference with a business relationship.

Ultimately, the circuit court summarily dismissed WLRD's claim, concluding:

The Court issued its order after hearing testimony for at least two days and reading numerous briefs, affidavits, and other information. . . . [T]he Court found that [UG] properly terminated the contract. That K2 had substantially complied with the [CLA]. The Court allowed K2 to subrogate. And therefore, the Court finds, as a matter of law, that WLRD cannot be successful on their claim whether they want to call it a claim for tortious interference with a contractual relationship, or tortious interference with a business expectancy.

WLRD now appeals.

## II. SUBROGATION

WLRD cites the standard of review for a summary disposition motion in relation to all its appellate challenges. However, the subrogation issue was not resolved on summary disposition. Rather, the circuit court conducted an evidentiary hearing, made findings of fact and conclusions of law, and resolved the issue. Accordingly, our review is akin to appellate review following a

bench trial. We review for clear error the court's factual findings and review de novo the court's legal conclusions. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003).

As noted, MCL 570.1107(4) provides the remedy of subrogation in a construction lien matter:

> If the rights of a person contracting for an improvement as a land contract vendee or a lessee are forfeited, surrendered, or otherwise terminated, any lien claimant who has provided a notice of furnishing . . . and who performs the covenants contained in the land contract or lease within 30 days after receiving actual notice of the forfeiture, surrender, or termination is subrogated to the rights of the contracting vendee or lessee as those rights existed immediately before the forfeiture, surrender, or termination.

There is very limited caselaw citing this provision and none analyzing its language. In *Norcross Co v Turner-Fisher Assoc*, 165 Mich App 170, 180; 418 NW2d 418 (1987), this Court merely acknowledged that a lienholder may elect "to subrogate himself to the rights of the contracting vendee or lessee" in lieu of foreclosure. This Court noted, "The subrogation right is but one of several rights granted to lienholders. It is not the exclusive remedy under the act." *Id*. This Court cited *Norcross* and MCL 570.1107(4) in *AFP Specialists, Inc v Vereyken*, 303 Mich App 497, 505; 844 NW2d 470 (2014), but only to note that this Court "liberally constru[ed]" the statute. Despite this lack of guidance, the language of this provision is clear and unambiguous.

Relevant to the current matter, K2 was required first to establish the existence of a valid construction lien under MCL 570.1107(1) and MCL 570.1111. Under § 107(4), K2 was then required to establish that (1) the purchase agreement was terminated and (2) K2 acted within 30 days of the purchase agreement's termination toward performance of that contract.

## A. VALIDITY OF THE LIEN

Relevant to the validity of the lien, WLRD contends that the circuit court was required to ascertain the actual amount of the lien at the subrogation hearing. WLRD asserts that it made a prima facie showing that K2's lien was fraudulent and therefore invalid. WLRD further claims that the court erred in finding that work continued after the stop work order entered, rendering the lien untimely.

MCL 570.1302(1) states that "[s]ubstantial compliance with the provisions of [the CLA] shall be sufficient for the validity of the construction liens provided for in this act . . . ." MCL 570.1107(1) requires that a construction lien "not exceed the amount of the lien claimant's contract less payments made on the contract." In the context of the former mechanics' lien laws that were replaced by the CLA, this Court held that a lien is not invalid merely because the lien amount was later found to exceed the actual amount owed. A lien is only invalidated if the claimant's "bad faith is evident." *Tempo, Inc v Rapid Electric Sales & Serv, Inc*, 132 Mich App 93, 104; 347 NW2d 278 (1984). An error due to a good faith mistake is remedied simply by reducing the amount of recovery. *Id*. This Court has applied this principle to liens filed under the CLA as well. See *Alan Custom Homes*, 256 Mich App at 512-513.

K2 was not seeking repayment or to foreclose the lien, situations in which K2 could potentially collect funds beyond what it was owed. Accordingly, as determined by the circuit court, the exact amount of the lien is not relevant here. As long as K2's lien was calculated in good faith, it could support subrogation.

Although WLRD attempted to establish that K2 fraudulently inflated the amount of the lien, the court did not clearly err in rejecting that position based on the evidence presented.

> To establish a prima facie case of fraud, a plaintiff must prove that (1) the defendant made a material representation, (2) the representation was false, (3) the defendant knew that it was false when it was made, or made it recklessly, without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that the plaintiff would act on it, (5) the plaintiff acted in reliance on it, and (6) the plaintiff suffered injury because of that reliance. [*Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 38-39; 761 NW2d 151 (2008).]

As evidence of fraud, WLRD points to a QuickBooks printout presented by Krstovski in the receivership action. That document states that as of July 25, 2022, WLRD owed K2 $79,818.12. WLRD expressed disbelief that K2's billables could have increased more than $900,000 by September 9. However, the QuickBooks document pertained to work performed only on Phases I and II, not III through VI, and were not a complete picture of WLRD's debt to K2. At the evidentiary hearing, Cisek and Krstovski testified that K2 had performed extensive work on Phases III and IV despite that WLRD had yet to purchase them from UG. This work was necessary to support the work performed on Phases I and II. K2 and its subcontractors had dug a retention pond, installed underground utilities, and built a road. Dirt removed from Phases I and II was stored on Phase III for later grading of the remaining phases. Money had been expended on engineering reports and architectural designs for the entire property. Krstovski noted that some subcontractors had filed liens against Phases I and II for the unpaid work they had performed on Phases III and IV for lack of a better option. Krstovski further explained that "any costs associated with the future phases would be carried by K2 until the time of funding was in place to get reimbursement for." Accordingly, it had no opportunity to collect these accrued costs. K2 presented a forensic audit report prepared for the receivership case indicating that K2 was owed $1.2 million. Given that K2 would ultimately require $70 million in financing to complete Phase III, the $1.2 million lien was not out of bounds.

WLRD further contends that K2 presented a falsified invoice into evidence. The invoice dated April 6, 2022 indicates that K2 billed WLRD $925,000 for services related to Parcel III. WLRD posits that this invoice is fake because it was not presented to the receiver. Again, the receiver only took possession of Phases I and II of the development and the court only ordered Krstovski to present documents related to Phases I and II. The subject invoice pertains to work on Phase III. Overall, there was sufficient evidence for the circuit court to find that although the amount cited in the lien might not be accurate, it was not fraudulent.

The record also supports the court's conclusion that K2 continued working through September 9, 2022, making its lien timely. Cisek and Krstovski admitted that a stop work order entered in May 2022. They both indicated, however, that industry standards required additional

work beyond that date. Cisek testified that occupational safety regulations prohibit contractors from leaving job sites in an unsafe condition. Trenches had been dug that required filling and temporary power sources had to be removed. The drainage system for the retention pond had to be completed to prevent flooding. Krstovski explained that additional substantive work was required on Phases I and II because K2 had "sold these assets before they were completed" and "they needed to be done in order . . . to get out of" the loans secured for the project. K2 therefore "convinced the subcontractors to continue doing the work."

Ultimately, the circuit court correctly interpreted and applied the relevant law and given the evidence presented at the evidentiary hearing, the circuit court did not clearly err in finding K2's lien valid.

## B. TERMINATION OF PURCHASE AGREEMENT

The first step for application of MCL 570.1107(4) is to determine if the rights of the land purchaser have been "forfeited, surrendered, or otherwise terminated." The circuit court determined that the purchase agreement was terminated as a result of WLRD's failure to timely purchase the next phase of the development. The circuit court did not address WLRD's challenges based on other provisions of the purchase agreement. However, consideration of the purchase agreement as a whole supports that UG properly terminated it.

Consideration of this issue requires reliance on several provisions of the purchase agreement. "Our goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Kendzierski v Macomb Co*, 503 Mich 296, 311; 931 NW2d 604 (2019) (quotation marks and citation omitted). A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005).

Section 2(b)(3) of the purchase agreement required WLRD to purchase a third phase of the development within 24 months of the Phase I closing. That date was August 17, 2022. WLRD allowed that date to pass without purchasing an additional phase. UG notified WLRD of its breach and permitted it 30 days to comply as provided in § 19(a) of the purchase agreement. WLRD missed that deadline as well. The court correctly determined that WLRD's breach triggered UG's right to terminate the contract under the same section.

This does not end the inquiry as WLRD contends that other provisions of the purchase agreement excuse its breach. WLRD asserts that UG breached the purchase agreement first because it was required to present clear title to the land. WLRD demanded that UG pay off K2's lien to clear the title, but UG refused. Section 4(b)(i) of the purchase agreement provides that "[o]n each applicable Closing Date, Seller shall execute and/or deliver to Purchaser" "[a] warranty deed . . . conveying the applicable Property to Purchaser, free and clear of all encumbrances, except the Permitted Encumbrances hereafter defined." When read in a void, this provision seems to require UG to clear K2's lien. But the contract must be read as a whole. *Auto Owners Ins Co v Olympia Entertainment, Inc*, 310 Mich App 132, 145; 871 NW2d 530 (2015). Other provisions of the purchase agreement clarify that UG was not liable or responsible for clearing K2's lien.

First and foremost, UG is not responsible for the costs of any improvement to or construction on the property, WLRD is. It follows that WLRD alone would be responsible for a lien arising from the costs of any improvement or construction. Section 5(e) of the purchase agreement provides:

> Purchaser shall pay the cost for all site improvements and infrastructure for all Phases of the development, including but not limited to, roads (including curb and gutters) and utility extensions . . ., all costs to install said road gutters and utilities extensions, plus the cost of all storm water retention and engineering services for the development.

K2's lien was based on "the cost for all site improvements and infrastructure." If payment of those costs was outstanding, it was WLRD's contractual duty to pay them.

Section 3(a) of the purchase agreement provides that the purchaser's obligations are contingent upon title being "found acceptable" or being "made acceptable, in accordance with the requirements and terms of Section 6 of this Agreement." Again, read in a void, this section appears to require UG to clear K2's lien. Again, it does not.

Section 6 referenced in § 3(a) is entitled "Title Examination" and provides, in relevant part:

> Title Examination will be conducted as follows:
>
> a. **Purchaser's Objections to Title.** Prior to the expiration of the Inspection Period, as may be extended pursuant to Section 3(b), Purchaser will make, in writing, any objections (the "Objections") to any matters disclosed in the Title and Survey that are not acceptable to Purchaser. Any matter shown on such Title and Survey and not timely objected to by Purchaser shall be a "Permitted Encumbrance" hereunder. . . .

Section 3(b) is entitled "Soil Tests" and provides:

> Purchaser shall have determined, on or before the first business day which is ninety (90) days from the Effective date (the "Inspection Period") that Purchaser is satisfied with the results of and matters disclosed by such soil and geotechnical tests of the Property as Purchaser may deem necessary, all such tests to be obtained at Purchaser's sole cost and expense. So long as Purchaser is diligently conducting its inspection, the Purchaser may, in its sole discretion, extend the due diligence period for two (2) consecutive periods of sixty (60) days each . . . upon notice to Seller and payment of additional earnest money of Fifty Thousand and 00/100 ($50,000) Dollars for each Extension Period, prior to the expiration of the Inspection Period or applicable Extension Period. . . .

Also relevant is § 2(f), which clarifies:

> For avoidance of any doubt, Purchaser and Seller acknowledge and agree that unless this Agreement is terminated by Purchaser prior to the expiration of the Inspection Period (as defined in Section [3](b)) or in accordance with the terms of

Section 19, Purchaser shall have an obligation to close all phases and purchase the entire Property.

Read together, these provisions permitted WLRD to conduct a preliminary inspection of the property, including soil and geotechnical tests and to complete a survey. WLRD then had 90 days to object to "any matters" revealed that were "not acceptable" to it. If WLRD did not object, those existing matters would be deemed "permitted encumbrance[s]." These provisions did not require a new inspection period before closing on the purchase of each phase. The duties and rights imposed pertained only to the initial closing, following testing and surveying of the entire property.

Based on the contract as a whole, UG had no duty to clear K2's September 2022 encumbrance. WLRD's duty to purchase the next phase of the development was not excused. WLRD breached the purchase agreement by failing to cure its default within the 30-day grace period and UG was permitted to terminate the contract.

## C. K2 ACTED WITHIN 30 DAYS

The final step under MCL 570.1101(4) is to show that K2 "peform[ed] the covenants contained in the land contract or lease within 30 days after receiving actual notice" of the purchase agreement's termination. K2 acted swiftly and diligently to seek its remedies in these legal proceedings. Krstovski testified that K2 was ready to purchase the next phase of the development immediately upon being granted the right of subrogation, and K2 actually did so. This requirement was adequately met.

Contrary to WLRD's protestations, the circuit court properly granted K2's motion for subrogation. WLRD is not entitled to relief in this regard.

## III. TORTIOUS INTERFERENCE WITH A CONTRACT

The circuit court summarily dismissed WLRD's tortious interference with a contract claim pursuant to MCR 2.116(C)(10). We review de novo a lower court's decision on a motion for summary disposition. *Zaher v Miotke*, 30. 0 Mich App 132, 139; 832 NW2d 266 (2013).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Id*. at 139-140 (quotation marks and citations omitted).]

As described by this Court in *Health Call of Detroit v Atrium Home & Health Care Svcs, Inc*, 268 Mich App 83, 89; 706 NW2d 843 (2005), "In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a

business relationship or expectancy." To establish a claim of tortious interference with a contract, the pleading party must show "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Id*. at 90. The final element is a recognition that "tortious interference with a contract is an intentional tort." *Knight Enterprises, Inc v RPF Oil Co*, 299 Mich App 275, 280. To support this element, the plaintiff must show "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights . . . of another." *Id*. (quotation marks and citations omitted).

There is no factual issue that K2's lien was filed unjustifiably to interfere with WLRD's contract. WLRD relies on its claim that K2 fraudulently inflated the amount of its lien to ensure that WLRD could not clear it, opening the door for K2 to purchase the development out from under it. The circuit court resolved that issue at the evidentiary hearing on subrogation. As noted, that decision was supported by the evidence. The propriety of the subrogation resolved this issue. Accordingly, there was nothing left to resolve at trial.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick

-11-